UNITED STATES of America

v.

Steven Aubrey BURNETTE.

No. 1:06–CR–172.

United States District Court,
E.D. Texas,
Beaumont Division.

Nov. 16, 2007.

Order Overruling Objections
Jan. 31, 2008.

Gerard Raphael Rawls, U.S. Attorney's Office, Beaumont, TX, for Plaintiff.

Steven Aubrey Burnette, pro se.

Gary R. Bonneaux, FPD, Orange, TX, stand-by counsel.

### ORDER ADOPTING UNITED STATES MAGISTRATE JUDGE'S REPORT

RON CLARK, District Judge.

Defendant Steven Aubrey Burnette moves to suppress any incriminating state-

ments he allegedly made to agents of the Office of Inspector General, Department of Justice.

The court referred this matter to the Honorable Earl S. Hines, United States magistrate judge, at Beaumont, Texas, for consideration pursuant to applicable laws and orders of this court. Judge Hines concluded that the alleged incriminating statements were not made during a custodial law-enforcement interrogation, were voluntary, and were not obtained in violation of *Miranda* or the Fifth or Sixth Amendments. Judge Hines therefore recommended that the motion to suppress be denied.

No objections have been filed. Accordingly, the findings of fact and conclusions of law of the magistrate judge are correct and the report of the magistrate judge is **ADOPTED.** It is further

**ORDERED** that defendant's motion to suppress (Docket Nos. 20 & 25) is **DENIED.**

So **ORDERED** and **SIGNED** this 15 day of **November, 2007.**

## *ORDER OVERRULING LATE OBJECTIONS TO SUPPRESSION REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE*

RON CLARK, District Judge.

Following a formal suppression hearing, the Honorable Earl S. Hines, United States magistrate judge, submitted a report recommending that defendant's motion to suppress incriminating statements allegedly made to agents of the Office of the Inspector General be denied. That recommendation was adopted without objection on November 16, 2007.

Defendant filed late objections which the court now elects to entertain. This requires *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C).

After conducting such review, the court concludes that the magistrate judge's findings, conclusions and analysis are correct. Defendant raises no significant new substantive arguments that the magistrate judge did not carefully consider and correctly evaluate in his report and recommendation.

■ The objections raise several new subsidiary issues that also do not warrant rejecting the magistrate judge's report. The magistrate judge acted within his discretion to allow an out-of-town defense witness to testify out of turn in order to avoid having the witness appear for a second time. No objection was voiced at the time, and defendant's after-the-fact suggestion of ensuant prejudice is conclusory and unsupported by any specific manifestation.

■ Similarly, the magistrate judge acted within limits of sound discretion in refusing to allow the defendant to cross examine on irrelevant issues relating to general conditions of confinement, and to persist unreasonably in asking redundant and testimonial questions. Finally, there is no evidence of bias or omission of evidence important to the suppression issue in the magistrate judge's report.

■ The court also independently has considered whether a Sixth Amendment violation occurred when agents of the Office of Inspector General resumed an interview after defendant asked to confer with counsel, and did in fact confer telephonically with counsel. Although that decision was risky, the court concludes, as did the magistrate judge, that the Sixth Amendment was not implicated. Before there can be a Sixth Amendment violation, the right must *attach* and then be *invoked*, in that order. Here, the right was invoked, but had not yet attached because no

adversary proceedings had been initiated against Burnette.

It is therefore **ORDERED** that defendant's objections are **OVERRULED**.

## *REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

EARL S. HINES, United States Magistrate Judge.

Defendant, Steven Aubrey Burnette (hereafter "Burnette") is charged in a two-count indictment with making false statements in a matter within the jurisdiction of the executive branch of the Government of the United States, all in violation of Title 18 U.S.C., Section 1001. Specifically, Burnette is charged with making false, sworn, written statements to special agents of the Office of the Inspector General, Department of Justice (OIG).

The United States proposes to offer evidence at trial that Burnette later admitted to OIG agents that his sworn statements were untrue. Burnette denies that he made such admissions, but, alternatively, seeks to suppress those alleged statements from being used against him at trial.

### I. PROCEDURAL STATUS

This case is assigned to Hon. Ron Clark, United States District Judge, who by order entered on July 9, 2007, referred Burnette's motion to suppress to the undersigned for report and recommendation. (Docket No. 23). Evidentiary hearings on

the motion were held on September 4 and 17, 2007. Testimony was received from (1) Derric Wilson, a Special Investigative Agent at the U.S. Federal Correctional Complex in Beaumont, (2) Fred C. Ball, Jr., and John Schwartz, both Special Agents of the Office of Inspector General during all relevant times,[1] (3) Glenn Cortello, Esq., an attorney in Alexandria, Louisiana, and (4) Burnette. In addition, the court received several documentary exhibits offered by each side.

This report now addresses defendant's motion to suppress, as amended.[2]

### II. FACTUAL BACKGROUND

Steven Aubrey Burnette, an inmate at the Federal Bureau of Prisons (BOP), is serving a 141–month sentence for armed bank robbery. He has been in BOP custody since June, 2000. During his incarceration, Burnette has been housed at the Federal Correctional Institution in Beckley, West Virginia, and United States Penitentiaries in Pollock, Louisiana; Beaumont, Texas; and Atwater, California.

Burnette, while competent to stand trial, is emotionally disturbed. He has a major depressive disorder—moderate—with paranoid and antisocial features. His psychological profile is consistent with persons who ruminate about their relative ill-health as a central source and outlet for their anxiety. This, together with a pervasive mistrust of all correctional staff and inmates, has resulted in Burnette's poor institutional adjustment in every facility where he has been housed.[3]

---

1. John Schwartz now works for a different federal agency, U.S. Customs and Border Protection, as Director of the Credibility Assessment Division.

2. Burnette's "Motion to Suppress Statements," was filed April 10, 2007. (Docket No. 20). On July 23, 2007, he filed an "Amended Motion to Suppress Statements." (Docket No. 25). The parties agree that the

amended motion supercedes the original. Tr. at 25, Sept. 4, 2007.

3. Burnette's pervading mistrust manifested itself during this action. Burnette chose to represent himself rather than accept legal representation by the Federal Public Defender, who, in Burnette's mind, would be so intimidated by the prosecution that he cannot or would not represent Burnette zealously or effectively. Burnette's rationale stems from

Specifically, and relevant here, Burnette believes that he has been severely mistreated by BOP medical staff at each facility. Also, Burnette believes that BOP attempts to cover up its significantly substandard medical treatment practices. In the case now pending, he perceives that BOP generated fraudulent documents purporting to show that *he* refused medical treatment when in fact *correctional staff* refused to offer or provide it to him.

Between July, 2002, and February, 2006, Burnette was housed at the United States Penitentiary (USP) in Pollock, Louisiana. While there, he was the victim of an inmate assault on June 9, 2004. He subsequently alleged that certain correctional officers facilitated and allowed the assault to occur in retaliation for his supposed insolence and failure to acquiesce in those officials' corruption. Burnette further claimed that medical personnel at USP Pollock refused to provide him medical treatment after the assault, and then falsified documents stating that Burnette refused medical treatment. Finally, Burnette alleged that he was sexually victimized by a BOP medical staff member at USP Pollock.

Burnette wrote the Department of Justice's Office of the Inspector General complaining of the above staff misconduct towards him while he was in USP Pollock. OIG Special Agent Lori Gray interviewed Burnette, but Burnette never heard anything further regarding findings or disposition of his complaint. Accordingly, in January of 2006, Burnette wrote more letters to OIG, and filed multiple lawsuits accusing the Bureau of Prisons of widespread violations of his civil rights. Shortly thereafter, on February 2, 2006, Burnette was transferred to USP Beaumont.

Burnette wrote OIG again in May or June of 2006. This time, he repeated his allegations regarding misconduct by BOP officials, but also added allegations of an official cover-up by the Office of the Inspector General. Moreover, in that letter, Burnette requested that OIG administer to him a video/audio recorded polygraph examination to "bolster his credibility."

Special Agent Ball was assigned to investigate Burnette's allegations. Between late June and early August of 2006, Special Agents Ball and Schwartz interviewed Burnette on four different occasions. These interviews all occurred under the same protocol. A regular correctional officer would remove Burnette from his cell and then escort him, in hand restraints (per routine policy for escorting inmates), to the Receiving and Discharge area of the prison. That secluded area in the prison generally has a lot of staff, does not have inmates other than those on their way out or just arriving, and offers a private place for an interview. The location enhanced Burnette's safety in that no other inmates who might recognize him would perceive that he was cooperating with law enforcement.

The interviews would occur, and then Burnette would be escorted back to his cell in the same manner. The only difference in the procedures for the four interviews was that on the first occasion, hand restraints were not removed. On the remaining three occasions, hand restraints were removed while he spoke with the OIG agents.

The first interview occurred on June 27, 2006. Agents Ball and Schwartz attempted to obtain an affidavit from Burnette regarding his allegations. Burnette was asked to articulate his allegations, and Agent Ball then typed up Burnette's statement. The interview continued for a few hours, but Burnette declined to sign the typed statement because Burnette did not

---

the fact that both the prosecutor and defender are federal officials.

agree with "their interpretations of [his] answers to their questions." He told the agents that he preferred, instead, to document his complaints in his own words. The interview ended.

The second interview occurred on August 2, 2006. This time, Burnette was given a pen and paper, and was permitted to write his own sworn affidavit. Although Burnette labored over his affidavit for over four hours without finishing, the agents asked him to stop around 8:30 p.m. and Burnette signed the sworn affidavit. He and the agents discussed finishing the affidavit at a later date.

The third interview occurred two days later, on August 4, 2006. Burnette again was provided pen and paper, and he again commenced writing. After an additional four hours, the agents asked him to stop, and Burnette again signed the sworn affidavit. He told Special Agent Ball that he still was not finished writing out his allegations and Agent Ball said that he would return on another day.

Before that third interview terminated, they also discussed the possibility of Burnette taking a polygraph examination. Agent Ball said that he could administer that examination when he returned. Burnette testified that he "initiated the polygraph test and ... wanted to go through with it."

The fourth interview—the one of primary relevance to the pending motion—occurred three days later on August 7, 2006. Agents Ball and Schwartz returned to administer a polygraph examination. When Burnette was escorted again to the Receiving and Discharge area of the prison, he thought that he probably would be completing his affidavit. This time, however, when he arrived in the interview room, he was asked to take a polygraph exam. Special Agent Ball told him that Special Agent Schwartz was there to administer the polygraph examination.

Agent Ball explained to Burnette that the agents were still in the phase of trying to determine "whether there was a basis for the allegations" Burnette had made. Agent Ball also stated to Burnette that he "was there to investigate allegations and ... to determine the credibility and the truthfulness of those allegations." What Agent Ball did *not* disclose to Burnette, however, was that he had secured permission from his supervisor, Carlos Capano, to conduct the examination, and that he applied for such permission in order to determine: (1) "Did Burnette provide a false statement to the OIG when he said he never refused medical treatment for his June 9, 2004, injuries?" and (2) "Did Burnette provide any other false statements to the OIG?" (Def.Ex. 1).[4]

Unfortunately, the evidence is both unclear and disputed as to the exact chronology of the ensuing events during the August 7, 2006, interview. Burnette relates a muddled and self-serving version. Agents Ball and Schwartz gave clearer, more easily understood versions, but their memories were foggy. Agent Wilson, who was not present the entire time, recalled some of the details differently than did Agents Ball and Schwartz.

Despite these ambiguities, the evidence preponderates in favor of certain relatively undisputed facts. Agent Ball advised Burnette of his *Miranda* rights,[5] and Burnette

---

4. While testifying at the suppression hearing, Agent Schwartz volunteered that Agent Ball's application was worded in that accusing way only as "an agency preference for semantics," and that investigating Burnette criminally for making false statements was not actually the main reason for the polygraph.

5. As used herein, the term *"Miranda"* is a colloquial reference to the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. *See* Section IV.B, *infra*.

signed a written waiver of those rights. (Gov't Ex. 3). Agent Ball explained polygraph procedures to Burnette, and Burnette signed a "Statement of Consent" agreeing to proceed with the examination. (Gov't Ex. 4). At some point, either before or after he executed these documents, and either before or during further questioning, Burnette asked for a recess in order to speak with an attorney.

Burnette testified he made this request at the beginning of the meeting. Special Agent Schwartz estimated that Burnette made this request approximately one-half or two-thirds of the way through the two or three hour meeting. In any event, when the request was made, the agents stopped the interview, and placed a telephone call to an attorney that Burnette named, Glenn Cortello, Esq., of Alexandria, Louisiana. The agents placed a call to Mr. Cortello, and allowed Burnette to speak with him privately.

Mr. Cortello testified forthrightly at the suppression hearing. He stated that he was not retained by Burnette, but was hired by Burnette's mother to have a few consultations with Burnette. One of the agents told him that Burnette wished to speak with him. Mr. Cortello then agreed to speak with Burnette.

When they conversed, Burnette explained to Cortello that he had filed complaints against BOP and OIG officials. He asked whether he should make a statement to the OIG agents. Mr. Cortello advised Burnette that he "had a right not to make a statement, but that if [he were] going to proceed with [his] complaint, [he] needed to cooperate...." He also advised him of the consequences of giving false statements to federal government officials.

Mr. Cortello also spoke with Agent Ball. Mr. Cortello recalled Agent Ball stating that they were there to investigate the "validity of the complaint," and that he (Ball) was there "to assist" Burnette in his complaint. Agent Ball did not disclose that Burnette was the target of a criminal investigation. Rather, he told Mr. Cortello that Burnette was "specifically not the target of a criminal investigation." Mr. Cortello testified that had the agent told him he was there to interrogate Burnette for making false statements, he would have advised Burnette to not make a statement.

As mentioned earlier, the evidence is unclear and disputed as to exactly when during the two or three hours that the agents met with Burnette on August 7, 2006, the telephone conference between Burnette and Cortello occurred. It is undisputed, however, that after Burnette conferred with Mr. Cortello, he elected to continue with the polygraph examination. Burnette testified that they read him his rights and he signed the waiver after he spoke to Mr. Cortello, and decided to go ahead with the examination.

It also is undisputed that Agent Ball left the interview room and stationed himself in an adjacent room which was equipped so that he could monitor the examination without actually being present. Agent Schwartz then commenced a routine and standard pre-test procedure. He first determined that Burnette was fit for the examination. He then asked basic technical questions such as, "Are the lights on in this room?" to establish a base-line response for truthful answers that would help insure validity of the exam.

Another purpose for the pre-test interview was to make sure that Burnette understood in advance the questions that would be asked. It was designed to dispel confusion prior to the exam so that during the exam there would be no "surprise stimulus introduced." Otherwise, the results could be skewed.

Agent Schwartz devised in advance his proposed questions. He developed them

by reviewing OIG's case file, and by discussing the case generally with Agent Ball. During the pre-test interview, however, he disclosed those proposed questions, and allowed Burnette to have input into what questions would be propounded and the exact wording thereof.

Burnette and Schwartz then commenced negotiating the form of the questions that Burnette would be asked. These negotiations were never completed, and the polygraph examination itself never occurred because Burnette abruptly terminated the interview. Agent Ball testified that he did not know why Burnette declined to proceed further. Burnette testified that the interview ended because he requested to speak with a lawyer again.

Special Agent Ball then returned to the room. Agents Schwartz and Ball, according to Burnette, were both angry, and harsh words passed between them. Burnette testified that Agent Ball listed several allegations he thought Burnette was lying about, and threatened to have him prosecuted. Burnette was put back in restraints, and escorted back to his cell.

At some point during the earlier pre-test negotiations over wording of questions that would be asked during the actual polygraph examination, and before Burnette refused to continue, he allegedly made statements to Agent Schwartz, monitored by Agent Ball, that contradicted and disavowed his sworn affidavits signed on August 2 and 4, 2006. Specifically, Burnette allegedly admitted that *he* declined medical treatment following the June 9, 2004 assault, rather than BOP medical staff refusing to offer or provide it. He also allegedly admitted that he was *not*

sexually assaulted by a medical staff member at USP Pollock.[6]

Unfortunately, the record does not reliably disclose *when* these alleged incriminating statements were made, other than that they were made during the pre-test procedure as Agent Schwartz and Burnette negotiated the wording and structure of the questions to be propounded later. Special Agent Schwartz, to whom the statements allegedly were made, cannot recall whether they were made before or after Burnette recessed the pre-test interview in order to consult with counsel. While he could not specifically recall, Agent Schwartz thinks that Burnette made the statement regarding the sexual assault *before* talking to attorney Cortello, but made the statement regarding offers of medical care by BOP medical staff *after* he talked to his attorney. Burnette denies that he made any inconsistent statements or admissions. He testified that if he did make admissions, they would have been after he talked to Mr. Cortello.

Finally, Burnette testified that during the episode on August 7, 2006, he subjectively felt like Agent Schwartz placed him under arrest once he read *Miranda* warnings to Burnette. He, therefore, told Mr. Cortello that he was not "comfortable with the situation" because he felt like the agents were "pursuing him for some type of criminal charges." He thought that the nature of the investigation had changed because the agents had become "pushy," and they were requiring him to put all his allegations in writing and swear to them under oath. He said he did not think the agents' intentions were what they said.

---

**6.** Burnette's allegation regarding sexual assault is not an indicted offense. The United States, therefore, does not intend to introduce any evidence relevant to that statement in its case in chief, and will not offer the evidence except in rebuttal to evidence, if any, offered by Burnette. Thus, Burnette's allegedly false statement regarding the sexual assault and his subsequent alleged retraction are not relevant to the case or to defendant's motion to suppress.

He didn't think the agents told Mr. Cortello the truth about their intentions.

Burnette testified, however, that he was not afraid of the handcuffs, and they did not make him make any statements; they only made it uncomfortable. Further, he then decided, notwithstanding his suspicions about the agents' intent, to proceed with the examination because he did not want to look bad or look like a liar. He felt that if he didn't go through with the examination, he would look like he had been lying. Therefore, he signed the waiver of *Miranda* rights, signed the statement of consent to undergo a lie detector test, and voluntarily participated in the pre-test procedures utilized by Agent Schwartz.

### III. The Motion to Suppress

Defendant alleges that any incriminating statements he made on August 7, 2006, are not admissible because they were made in violation of 18 U.S.C. § 1501 and the Fifth and Sixth Amendments. Specifically, the motion alleges that he did not receive *Miranda* warnings before being interrogated, was not allowed to consult with an attorney, and was otherwise coerced, such that any statements were involuntary.

The United States responds that Burnette *was* given *Miranda* warnings, *was* allowed to speak to a lawyer, and voluntarily executed both a written waiver of his *Miranda* rights and a written consent to take a polygraph examination. Moreover, and as a threshold matter, the United States argues that *Miranda* warnings were not required in any event because Burnette was not subjected to a custodial interrogation.

### IV. Principles of Analysis

#### A. Burden of Proof

Burnette invokes the Fifth Amendment and *Miranda* exclusionary rule which provides that any statement made while under custodial interrogation is inadmissible at trial unless *Miranda* warnings are provided and the subsequent statement was given voluntarily. *Oregon v. Elstad*, 470 U.S. 298, 306–07, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There are shifting burdens in suppression hearings regarding confessions. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977). The movant must make "specific factual allegations of illegality," *and* show that he was under custodial interrogation when he made the admission at issue. *Id.* When the movant satisfies that initial burden, the ultimate burden then shifts to the non-movant, i.e., the United States, to prove by a preponderance of the evidence that the evidence was not illegally obtained. *Id.*

For example, in this case Burnette must first show that the allegedly incriminating statements at issue were made while he was subjected to custodial law enforcement interrogation. Then, the United States must show that *Miranda* warnings were provided; Burnette validly waived his *Miranda* rights; and the subsequent confession or admission of misdeeds was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (establishing burden for waiver); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (establishing burden for confession); *United States v. Watson*, 469 F.2d 362, 364–65 (5th Cir.1972).

#### B. *Miranda* Rights

■ Persons accused of crimes are protected from forced self-incrimination. (*"No person ... shall be compelled in any criminal case to be a witness against himself. ..."* U.S. Const. amend. V.) Moreover, once adversary judicial proceedings are initiated, accused persons are entitled to assistance of counsel for their defense. (*"[T]he accused shall ... have the assis-*

*tance of counsel for his defense."* U.S. CONST. amend. VI.) *See Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). In *Miranda,* the court held that one's privilege against self-incrimination applies during all stages of criminal proceedings, *including the investigation phase.* Moreover, the court concluded that confessions given in response to law enforcement interrogation while in custody are presumptively the result of coercion, and therefore inadmissible in the prosecution's case in chief. *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602; *see also United States v. Patane,* 542 U.S. 630, 631, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). To rebut that presumption and preserve the evidence's potential utility at trial, government officials must employ procedural safeguards effective to secure the privilege against self-incrimination when they interrogate defendants or suspects in their custody.

■ In such circumstances, a government official must provide the suspect or accused certain advice and warnings, including the right to remain silent, consequences of making incriminating statements and the right to consult with legal counsel.[7] *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Miranda,* 384 U.S. at 470, 86 S.Ct. 1602. The purpose of such information is

to ensure that the defendant does not feel compelled to talk to law enforcement, and knows that it is his choice whether to speak to law enforcement or not. Failure to provide the required advice and warnings will result in suppression of the defendant's statements:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

*Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

### 1. *Custodial Interrogation*

■ Since the entitlements referred to colloquially as *Miranda* rights attach only when a person is both in *custody* and under *interrogation,* it is important that the court define those critical terms. *Miranda* defined custodial interrogation generally as meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise *deprived of his freedom of action in any significant way." Id.* at 444, 86 S.Ct. 1602 (emphasis added).

### a. *Custody*

■ The determination of whether or not a person is in custody depends on how

---

7. *Miranda's* right to counsel warning is the Supreme Court's recognition that a custodial interrogation has "inherently compelling pressures." *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. The counsel warning is a "protective device" to ensure that the person's right against self-incrimination is not violated. *Id.* at 466, 86 S.Ct. 1602. The lawyer can ensure that the police are not being coercive (and, if they are coercive, the lawyer could testify in court); that the accused gives an accurate statement; and that it is accurately presented by the prosecution at trial. *Id.* at 470, 86 S.Ct. 1602.

In contrast, the purpose of the Sixth Amendment is to " 'protec[t] the unaided lay-

man at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (*citing United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). Thus, when a confession is obtained in violation of the Sixth Amendment, it is based on a criminal defendant's right to counsel during "criminal prosecutions," not on *Miranda's* procedural safeguard of a right to counsel warning. *Id.* at 175, 111 S.Ct. 2204.

a "reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

■ First, the fact that *Miranda* warnings are given is not *per se* evidence that a person is in custody. *United States v. Charles*, 738 F.2d 686, 693 n. 6 (5th Cir.1984). Warnings provided in a noncustodial setting do not convert that setting into a custodial one for *Miranda* purposes. *Id.* (*citing United States v. Lewis*, 556 F.2d 446, 449 (6th Cir.1977)). Such a rule could create the interpretation that *Miranda* warnings—intended to preserve an essential liberty—are instead a "restraint on the suspect." *Lewis*, 556 F.2d at 449.

An objective reasonableness inquiry has two general components: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt that they could terminate the questioning and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *State v. Pomeroy*, 713 So.2d 642, 645 (5th Cir.1998). The Fifth Circuit identified four factors that are relevant to these inquiries: (1) the length of the encounter; (2) the location of the encounter; (3) the number of officers present; and (4) the element of surprise in the encounter. *United States v. Fike*, 82 F.3d 1315, 1324–25 (5th Cir.1996) (*citing United States v. Bengivenga*, 845 F.2d 593, 598–600 (5th Cir.1988)) [ (overruled on other grounds) ].

■ The second factor, location, has obvious relevance to a statement made by a prison inmate. By the very fact of their incarceration and governance by institu-

tional rules and procedures, inmates clearly are "deprived of their freedom of action in a significant way." For *Miranda* purposes, however, they are not necessarily in custody. *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711; *United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir.1993). Merely because questioning takes place in a generally "coercive environment" does not necessarily mean the defendant is in custody for *Miranda* purposes. *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711. Instead, whether an interrogated prisoner is in such custody is evaluated by the standards articulated above, while taking into account the already-limited freedoms of a prison inmate. *See United States v. Menzer*, 29 F.3d 1223, 1231–32 (7th Cir.1994) (basing its determination of whether prison inmate was in custody on totality of circumstances); *United States v. Conley*, 779 F.2d 970, 974 (4th Cir.1985) (holding that custody for a prison inmate is determined by determining whether there was a change in surroundings that added to the prisoner's already-limited freedom of movement).

■ In addition, there is nothing inherent in a polygraph examination setting that automatically makes it custodial. *See Nenno v. Quarterman*, 489 F.3d 214, 217 (5th Cir.2007) (affirming district court holding that Nenno was not in custody during polygraph examination); *United States v. Gordon*, 638 F.Supp. 1120, 1133–34 (W.D.La.1986) (holding that multiple interviews by police, including polygraph examination, were not custodial, thus inquiry into whether waiver of *Miranda* rights not an issue), *aff'd*, 812 F.2d 965 (5th Cir.1987).

The objective reasonableness standard, aided by totality-of-the-circumstances analysis, is illuminated by considering hypothetically a police interview of a person already suspected of committing a crime or focused upon as a target of investiga-

tion. Such interview is not necessarily custodial interrogation. *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711; *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). That same interview, however, might be deemed custodial if the officer informs the suspect of his suspicions or tells the defendant that he is a target. *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526. The person's knowledge of being a suspect or target is a relevant factor to consider in determining whether a reasonable person would have felt free to leave.

### b. *Interrogation*

■■■■ Custodial statements are not *Miranda*-protected unless they are made as the result of "interrogation" by law enforcement. Volunteered statements are not barred by the Fifth Amendment. Thus,

> There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. ■■■■ Interrogations that trigger *Miranda* protections "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). However, interrogation encompasses not only "express ques-

tioning, but also … any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. Absent express questioning, only words or actions that would *reasonably* result in an incriminating response are considered as interrogation. *Id.*[8]

### 2. *Waiver*

■■■■ Persons under custodial interrogation may waive their Fifth and Sixth Amendment rights—assuming appropriate procedural safeguards have been employed—when they do so knowingly, voluntarily, and intelligently. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.[9] When that occurs, subsequent statements may be admitted at trial. *Missouri v. Seibert*, 542 U.S. 600, 608–09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The Supreme Court clearly holds that:

> giving the warnings and getting a waiver has generally produced a *virtual ticket of admissibility;* maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver.

*Id.* at 608–09, 124 S.Ct. 2601 (italics added).

■■■■ For a waiver to be voluntary, the decision to waive one's *Miranda* rights must be "the product of a free and deliberate choice rather than intimidation, coer-

---

**8.** Intent of a police officer is relevant to the extent that it goes to the "reasonableness" aspect. When an officer intends to get an incriminating response from the defendant, he should know that his practice is reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 302 n. 7, 100 S.Ct. 1682.

**9.** *See also, Patterson v. Illinois*, 487 U.S. 285, 292–93, 296–97, 108 S.Ct. 2389, 101 L.Ed.2d 261 (holding that once Sixth Amendment right to counsel attaches, valid waiver of *Miranda* rights is also a valid waiver of Sixth Amendment right to counsel).

cion, or deception." *United States v. Cardenas,* 410 F.3d 287, 293 (5th Cir.2005). In addition, the waiver must have been made with an awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it (the knowing and intelligent requirement). *Id.* Determination of voluntariness is based on the totality of circumstances, and is made on a case-by-case basis. *Id.* "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler,* 441 U.S. 369, 374, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (*quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). "Absent evidence that [a suspect's] 'will was overborne and his capacity for self-determination critically impaired' because of coercive police conduct, his waiver … was voluntary." *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

▇▇▇ An express oral or written waiver is not required. A valid waiver can be implied if the government can show that the person "*in fact* knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Butler,* 441 U.S. at 373, 99 S.Ct. 1755 (emphasis added); *McDonald v. Lucas,* 677 F.2d 518, 519 (5th Cir.1982). Moreover, in order for a waiver to be valid, a suspect does not have to have "a full and complete appreciation of all the consequences flowing from the nature and quality of the evidence in the case." *Barnes v. Johnson,* 160 F.3d 218, 223 (5th Cir.1998) (*quoting Elstad,* 470 U.S. at 317, 105 S.Ct. 1285). A waiver is not invalid just because the suspect is not aware of all the potential adverse consequences of his statements to police; the police falsely told the suspect that a co-defendant had confessed; the police did not inform the suspect of all of the subjects of the interrogation. *Elstad,* 470 U.S. at 317, 105 S.Ct.

1285; *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Barnes,* 160 F.3d at 223. Rather, a waiver is valid so long as the suspect understands the *Miranda* warnings.

▇▇▇ A waiver is valid even when trickery or deception is used by government officials, provided that such does not rise to the level of compulsion or coercion. *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In that regard, mere silence by law enforcement about the scope of an interrogation is not relevant to whether there was sufficient trickery to render a suspect's waiver involuntary. *Spring,* 479 U.S. at 576, 107 S.Ct. 851 (holding that agents' failure to inform suspect that he would be questioned about a murder was not relevant to whether his *Miranda* waiver was valid). "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Id.* at 577, 107 S.Ct. 851 (*quoting United States v. Washington,* 431 U.S. 181, 188, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)).

▇▇▇ Deliberate or reckless withholding of information from a suspect's attorney is objectionable as a matter of ethics. *Moran v. Burbine,* 475 U.S. 412, 423–24, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Even so, such conduct is relevant to the constitutional validity of a waiver only when it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the general consequences of abandoning them (i.e., that anything he says could be used against him). *Id.* Thus, even when a police officer failed to inform the *defendant* that he was the target of an investigation, and further told *defendant's counsel* that defendant was not a target, the Fifth Circuit declined to hold that the defendant's written *Miranda* waiver was involuntary and invalid. *United States v.*

*Tapp*, 812 F.2d 177, 179 (5th Cir.1987). The court reasoned that even though the person was not informed that he had become a target, his written waiver acknowledged that his statements could be used against him. *Id.*

█ Valid waivers may be revoked or dissipated by subsequent conduct. Thus, when a defendant waives his rights, but then invokes his right to consult with a lawyer, all questioning must stop unless he again waives his rights. *Miranda*, 384 U.S. at 445–46, 86 S.Ct. 1602; *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880 (1994). Therefore, an accused

> having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. 1880.

█ When interrogation is interrupted so that a person may confer with counsel, a court considering admissibility of that person's subsequent statements must examine whether (1) the defendant *invoked* his right to counsel; and (2) the defendant subsequently *waived* the right he invoked. *Id.* at 481–85, 101 S.Ct. 1880. The Supreme Court has addressed ambiguous requests for counsel in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). There, the court held that the test is objective. In order to invoke the right to counsel, the person "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459, 114 S.Ct. 2350.

## C. Title 18, United States Code, Section 1501

Congress enacted section 1501 two years after the *Miranda* decision. It was a legislative effort to partially overrule the judicially-created rules by codifying factors that courts should consider when determining whether statements made to law enforcement are voluntary. The statutory factors were the same factors courts used pre-*Miranda*. *Dickerson v. United States*, 530 U.S. 428, 433–34, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

The Supreme Court subsequently held that section 1501 is unconstitutional, as Congress cannot supercede a constitutional decision of the Supreme Court. *Id.* at 444, 120 S.Ct. 2326. *Dickerson* held that *Miranda* announced the constitutional minimum that Congress cannot override legislatively. *Id.* at 442–44, 86 S.Ct. 1602. By focusing only on voluntariness, section 1501 eliminated *Miranda's* requirement that pre-interrogation warnings need to be given. *Id.* at 442, 86 S.Ct. 1602.

Given the current invalidity of section 1501, the court need not consider it further in addressing Burnette's motion to suppress.

## D. Due Process Concerns

█ When evidence is challenged solely on *Miranda* grounds, the court must remain mindful that in order for an incriminating statement to be used by the prosecution in its case in chief at trial, the confession must comply with *Miranda* and also the due process clause of the Fifth Amendment. *Id.* at 433–34, 86 S.Ct. 1602. (*"No person shall ... be deprived of life, liberty, or property, without due process of law...."* U.S. CONST. amend. V.) Thus, even when *Miranda* does not apply, any admissible confession must still be voluntary. *Dickerson*, 530 U.S. at 433–34, 120 S.Ct. 2326.

▮ When *Miranda* does not govern, the United States continues to have a Due Process burden of establishing voluntariness of the statement by a preponderance of the evidence. The test for determining whether a statement is voluntary is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* at 434, 120 S.Ct. 2326 (*citing Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Voluntariness of a statement is based on the totality of the circumstances, taking into account the "characteristics of the accused and the details of the interrogation." *Id.* (*citing Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041); *Cardenas,* 410 F.3d at 293. This is essentially the same standard used to determine whether a waiver of *Miranda* rights is voluntary. *See* Section IV.B.2. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite officers' adherence to *Miranda* are rare." *Dickerson,* 530 U.S. at 430, 120 S.Ct. 2326.

## V. ANALYSIS

Given the shifting burdens that govern suppression hearings regarding confessions, this part will analyze evidence pertaining to issues on which Burnette has the burden of proof separately from evidence pertaining to issues on which the United States has the burden.

## A. Custodial Interrogation

▮ This section considers whether Burnette carried his burden of showing that he was subjected to custodial law-enforcement interrogation such that OIG and BOP agents with whom he dealt on August 7, 2006, were required by *Miranda* to employ procedural safeguards securing the privilege against self-incrimination. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The answer to that threshold question is clear: A reasonable person would have felt that he could terminate the interview and leave. Therefore, the agents' questions put to Burnette were not custodial, and *Miranda* advice, warnings and other safeguards were not required. *See id.*

Objective evidence points overwhelmingly to that conclusion. First, the August 7, 2006, polygraph examination was proposed or demanded by *Burnette,* not OIG agents. Burnette initiated contact with OIG for the exact purpose of obtaining a recorded polygraph test. But for his numerous letters, he would never have been talking to any agents. Burnette *knew* why he was being escorted out of his cell to the Receiving and Discharge area, so there was no element of surprise associated with the August 7 encounter. *See Fike,* 82 F.3d at 1324–25 (identifying four factors relevant to the objective reasonableness inquiry).

Second, a reasonable person situated similarly to Burnette would have understood that all communications were entirely consensual. The August 7 episode was the *fourth* occasion for Burnette to meet with the agents in a matter of about five weeks. On each prior occasion, *Burnette effectively imposed his will on the agents.* At the first meeting, he simply declined to sign a written statement transcribed and typed by Agent Ball. At the next meeting, the agents acceded to Burnette's demand to author and pen his own written statements. The agents accommodated that wish by allowing Burnette additional time—*twice*—and patiently waited for an aggregate of approximately eight hours over the course of two days while Burnette tediously wrote out his accounts of alleged misdeeds by BOP staff. The August 7 encounter did not last as long as these earlier meetings, so the "length of encounter" factor has minimal analytical significance.

Third, Burnette was subjected to no change in his surroundings that added to his already-limited freedom of movement. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *see also Menzer,* 29 F.3d at 1231–32; *Conley,* 779 F.2d at 974. As a matter of routine prison policy and procedure, inmates are handcuffed when escorted from their cells to other locations. Moreover, the use of handcuffs did not scare Burnette, nor did they make him feel compelled to make a statement. Finally, Burnette's handcuffs were removed once he arrived in the Receiving and Discharge area to meet with the agents.

Fourth, on the occasion specifically at issue, Burnette felt free to *negotiate* the exact language of the polygraph examiner's questions. It is unlikely that someone in a position to engage in hard bargaining is under coercive pressures of custody. Moreover, when negotiations did not progress as Burnette wished, he simply declined to proceed.

Finally, Burnette felt free to interrupt the session and contact a lawyer before proceeding. In that conversation, his lawyer expressly reminded him that he was in no way required to make a statement, but that making false statements could have serious consequences.

Burnette subjectively believed he was under arrest when Agent Schwartz read *Miranda* advice and warnings to him. However psychologically intrusive that might have been to Burnette, it would not have had the same effect on an objectively reasonable person unburdened by twisted and tortured thought processes emanating from a major depressive order with paranoid and antisocial features. As stated earlier, the mere fact that a *Miranda* warnings is given is not objectively reasonable evidence of custody. *Charles,* 738 F.2d at 693 n. 6.

In sum, no evidence, much less a preponderance, supports the threshold requirement of proving that the alleged incriminating statements that are the subject of the motion were made during custodial law-enforcement interrogation. Consequently, Burnette fails to carry his initial burden of proving that the statements were made under circumstances protected by *Miranda* and the Fifth or Sixth Amendments.

Since Burnette failed to carry his initial burden, the burden does not shift to the United States to prove that the evidence was not unlawfully obtained. Thus, the court may deny Burnette's motion to suppress insofar as it asserts *Miranda* violations without evaluating sufficiency of the United States' proof.

### B. Alleged *Miranda* Violations

For the sake of completeness, this section will discuss the *Miranda* issues. The analysis that follows will show that there were no *Miranda* violations in any event. Further, the discussion of the validity of Burnette's waiver will fully inform the corollary due process concern with whether Burnette's alleged incriminatory statements were voluntary.

Assuming *arguendo* that *Miranda* safeguards were required, Burnette now admits (although he claimed otherwise in his motion) that (a) *Miranda* warnings and advice were in fact provided; (b) his interview with Agent Schwartz was terminated when he asked to speak with Mr. Cortello, a trusted attorney; and (c) *after* conferring with counsel, he executed a written waiver of his rights and a consent to proceed with the polygraph examination. As noted earlier, that waiver in effect constituted a "virtual ticket of admissibility" of Burnette's subsequent statements. *See Seibert,* 542 U.S. at 608–09, 124 S.Ct. 2601.

Burnette's only colorable challenge to the validity of that waiver centers on the agents' questionable conduct in implying to

him and Mr. Cortello that they were investigating whether Burnette was a potential victim of BOP abuse, and affirmatively representing that Burnette was not a target of a criminal investigation. Agent Ball's application for permission to conduct a polygraph examination clearly targets Burnette as a suspect in an investigation of false statements to OIG, although both agents testified to the contrary.

 The agents' conduct may well have been ethically objectionable. *See Burbine*, 475 U.S. at 423–24, 106 S.Ct. 1135. But such unsavory conduct by government officials affects constitutional validity of a waiver only when it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and consequences of abandoning them. *See id.* Burnette makes no such claim here. To the contrary, he resolutely asserts that he *knew* or at least *suspected* that the agents were not telling the truth, and were, in fact, pursuing him for some kind of criminal charges. Moreover, he had been advised contemporaneously by Mr. Cortello of the very serious consequences of making a false statement to the agents. Notwithstanding his suspicions, and with counsel's advice in hand, Burnette nevertheless executed the waiver and voluntarily engaged in the pre-test interview and negotiations with Agent Schwartz so as to not look bad or look like a liar. In sum, OIG agents may have engaged in deception, but under the totality of the circumstances here, there is no basis for the court to conclude that Burnette's waiver was a product of such deception. *See Cardenas*, 410 F.3d at 293.

Finally, all agree that at least one of Burnette's alleged incriminating statements in question was made *after* he requested permission to consult with counsel.

Generally, such a request requires that further questioning cease unless the person being questioned reaffirms his waiver of *Miranda* rights. *Edwards*, 451 U.S. at 481–85, 101 S.Ct. 1880. Under the agents' version of the events, that might require the court to pause.[10] There is no evidence that Agent Schwartz repeated *Miranda* warnings after Burnette spoke to Mr. Cortello, or that Burnette executed a second written waiver. However, it is unnecessary for the court to engage in another totality-of-the-circumstances analysis to determine whether Burnette's actions constituted an implied waiver. This is because under *Burnette's* version of the events, he executed the written waiver *after* speaking with counsel. An express waiver moots implied waiver analysis. Burnette cannot now complain that an early waiver was revoked by invoking his right to counsel.

In sum, even if *Miranda* rights were triggered on August 7, 2006, the United States has carried its burden of showing by a preponderance of the evidence that the requisite procedural safeguards were employed and that Burnette executed a valid waiver thereof before making the alleged incriminating statements. At all times during the pre-test examination, Burnette understood the nature of his rights and the consequences of abandoning them (beyond even what the agents had stated). Thus, the motion to suppress should be denied in any event.

## C. Voluntary Statement

 Although due process analysis is analytically distinct from *Miranda* analysis, the factors discussed in relation to Burnette's waiver of his *Miranda* rights apply to and fully inform the court's deter-

---

**10.** Agent Schwartz testified that *Miranda* warnings were given and waived at the outset of the interview on August 7, 2006, and that Burnette's request for counsel did not occur until they were one-half to two-thirds through a two to three hour meeting.

mination of the voluntariness of the alleged incriminatory statements. The alleged statements must have been made of Burnette's own free will, and not coerced by the police officers. The discussion in Section V.B, above, illuminate that the agents used no coercion, and that whatever statements Burnette may have made were uttered voluntarily and with a well-nourished understanding of the consequences. Therefore, Burnette's statements were voluntary under the due process clause of the Fifth Amendment. This is not one of those rare situations where a "self-incriminating statement was compelled despite officers' adherence to *Miranda.*" *See Dickerson,* 530 U.S. at 430, 120 S.Ct. 2326.

## VI. RECOMMENDATION

For the reasons expressed herein, the defendant's motion to suppress, as amended, should be denied.

Dated Jan. 31, 2008.