United States Court of Appeals
Fifth Circuit

**F I L E D**

May 20, 2005

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

m 04-20449

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

ERICA CARDENAS,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, SMITH, and DeMOSS,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, we are asked to review the decision of the district judge in proceedings regarding the prosecution of alleged participants in an alien smuggling conspiracy. The judge ordered the suppression of one of two statements made by the defendant, Erica Cardenas, after her arrest.

The court suppressed the statement despite the uncontradicted evidence that Cardenas repeatedly, voluntarily, and unambiguously had waived her *Miranda* rights.[1] There is little evidence of coercive police conduct, and to the extent that the district judge found that such conduct took place, her conclusion is clearly erroneous.

Some of the government's behavior could be considered sloppy, and consequently any testimony relating the supposed admissions gleaned from the challenged interview is ripe

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

for impeachment. Such issues of evidentiary weight, however, have no bearing on Fifth Amendment analysis. It was, therefore, patently incorrect as a matter of law for the district judge to conclude that, viewing the decision in light of the totality of the circumstances, Cardenas's waiver was involuntary.

I.

In May 2003, agents of United States Immigration and Customs and Enforcement ("ICE") were engaged in an ongoing investigation of a large-scale alien smuggling organization operating out of the Rio Grande Valley and bringing undocumented aliens from Mexico to Houston, Texas. On May 14, agents from the Brownsville ICE office contacted agents from the McAllen office and requested assistance in recovering a three-year-old alien who had been separated from his mother. Based on information received via an undercover investigation, agents had learned that the smugglers holding the child wanted to make the exchange of the child at the La Plaza Mall in McAllen, Texas, near the Mexican border.

A.

At around 2:00 p.m. on May 15, a man (later discovered to be Juan Cisneros) delivered the child to agents posing as the child's family at the mall. After Cisneros had returned to his vehicle, tailed by undercover agents, those agents approached the vehicle to place Cisneros under arrest. Upon approaching the passenger side of the vehicle, agent Richard Serra observed a young woman, later identified as Cardenas, sitting in the vehicle holding a young infant.

Cardenas exited the vehicle, and although Serra still had his firearm drawn, Serra took the infant from Cardenas, backed away from the car, handed his firearm to another agent (as he was excoriated by a superior for his danger-

ous decision to handle both the gun and the baby), and placed the infant in an air-conditioned vehicle. Cardenas, Cisneros, and the baby were transported to the McAllen border patrol office. Sometime before 5:30 that evening, all three were transported to the Harlingen ICE office, at which point the infant had been returned to Cardenas's care.

Around 6:00 p.m., Serra and agent Jose Ovalle, Jr., began interviewing Cisneros and Cardenas. Cardenas and her infant were brought to a desk in the processing area of the office, which was equipped with a computer (on which Ovalle would transcribe Cardenas's statements as she answered questions). Cardenas was read her *Miranda* rights, and after it was ascertained that the infant was hers and not another smuggled child, she was allowed to contact someone to pick up the child so that the baby would not have to be placed into the custody of child protective services. Cardenas reached a neighbor, who arranged for a relative to come to the office to pick up the baby.

After arrangements were made, during which time it became apparent that she was proficient in English and Spanish, Cardenas was again administered *Miranda* warnings. Ovalle read each section of the standard advice of rights form to her in Spanish. After each line, Ovalle translated it into English. Cardenas, line-by-line, confirmed that she understood her rights. During the next two hours, she cooperated with the agents and answered questions about the smuggled child. At the conclusion of the interview, the agents reviewed the statement with her, and she confirmed by her initials that it was a correct transcription.

There is no evidence that, at any time that day, agents coerced Cardenas to waive her

2

*Miranda* rights. During the interview, Cardenas was offered food and drink and was allowed to tend to and feed her infant. She also told the agents that she did not want to have an attorney present and never indicated that she did not wish to speak with them.

After the interview, Cardenas and the infant were returned to a holding cell until a relative arrived to pick up the baby. At that point, Cardenas brought the baby to Cisneros to say goodbye and then turned the baby over to the relative. Because the Harlingen office did not have overnight accommodations and the Marshal's office in McAllen was closed for the evening, Cardenas and Cisneros were brought to the jail at the Harlingen Police Department.

B.

Between 7:00 and 7:30 the following morning, agents transported Cardenas and Cisneros to the federal building in McAllen for their initial appearance before a magistrate judge. Upon arrival there, Cardenas was taken to the detention area on the eighth floor. Because the criminal complaint had not yet been completed, however, Cardenas was not able to be placed on the 9:00 a.m. docket.

At the same time, on the sixth floor (the United States Attorney's office), the agents and Assistant United States Attorney ("AUSA") Luis Martinez discussed the investigation and the statement given by Cardenas the previous evening. Concluding that the statement was not entirely accurate, Martinez received authorization to seek further cooperation from Cardenas. According to the agents' testimony at the suppression hearing, the agents asked Cardenas whether she wished to speak to Martinez, and urged her to cooperate, telling her they believed her previous statement was untruthful. Cardenas then indicated she wished to speak to Martinez. Handcuffed, she

was brought from the detention area to a conference room in the U.S. Attorney's office.

What occurred at this point is the matter of some dispute. According to the government, agents again read Cardenas her *Miranda* rights from a form provided by the U.S. Attorney's office. Allegedly, Cardenas told the agents she understood her rights and signed the waiver form that included a waiver of her right to go before a magistrate judge.

Despite this story, *i.e.,* that the form was executed at the beginning of the interview (about 10:30 a.m.), the waiver form indicates it was signed at 1:58 p.m. According to the government, no time was initially entered, and 1:58 was erroneously added later by one of the agents. Apparently, however, the district judge did not accept this version, concluding that "the totality of the evidence indicates that the AUSA . . . at 1:58 p.m., immediately before the scheduled 2:00 p.m. magistrate docket, had the defendant sign the form waving her right to appear before the magistrate to be advised of her rights by this neutral judicial officer."

Nevertheless, the record indicates, and the district judge did not appear to disbelieve, that when Martinez arrived in the conference room, he reviewed with Cardenas her *Miranda* rights "very, very carefully, very slowly, very deliberately." Martinez testified that he advised Cardenas that she did not have to speak with him but that anything she said could be used against her in court, and that she could have an attorney immediately if she wanted one, even if she could not pay for one. Nevertheless, Cardenas chose to speak with Martinez and declined to have an attorney present.

Ovalle asked most of the questions during

3

this interview but did not electronically transcribe Cardenas's answers. Instead, he testified that he took notes of the interview from which he created a report some thirty minutes later. Despite taking notes while present, Ovalle admits that he was not in the room for the entire interview, but instead left the room a few times to make and receive telephone calls.

Although Serra and Martinez were present for the entirety of the interview, Ovalle never asked either person what was said in the interview during his absences. Suspiciously, both Ovalle's notes and those allegedly taken by Martinez were shipped to the U.S. Attorney's office in Houston, where both sets of notes allegedly have been misplaced. The only written account of the interview, therefore, is Ovalle's report written after the interview without full knowledge of what was said.

According to the testimony of the agents who were present for the interview, Cardenas's statement at the U.S. Attorney's office in McAllen differed significantly from her statement made the night before at the Harlingen ICE office. In the second interview, Cardenas allegedly conceded that she was with Cisneros when they drove to a man named Don Victor's house to pick up the smuggled child. She described Victor as a "smuggler of people" and admitted that Cisneros was to be paid $100 for delivering the child. Finally, according to Martinez, Cardenas admitted that she "would get some benefit" from the payment and realized that her conduct was wrong.

### C.
On the eve of trial, the district judge held an evidentiary hearing to consider Cardenas's motion to suppress, in which Cardenas conceded that she executed multiple *Miranda* rights waivers, but she contends the waivers

were the result of coercive and deceptive police conduct. Concluding that Cardenas had voluntarily waived her *Miranda* rights before the first interview, the district judge did not suppress the statements made at that interview. With respect to the second interview, however, the judge found that the conduct of the government "agents was rife with intimidation, coercion, and deception." Consequently, the judge did not believe that Cardenas had made a knowing and intelligent waiver of her rights, so the judge suppressed the statements made at the second interview, then stayed the trial pending the government's appeal of the suppression decision.

### II.
### A.
"'In reviewing a ruling on a motion to suppress a confession, we give credence to the credibility choices and fact finding by the district court unless they are clearly erroneous,' but 'the ultimate issue of voluntariness is a legal question reviewed *de novo*.' Likewise, 'a district court's determination regarding the validity of a defendant's waiver of his *Miranda* rights is a question of law reviewed de novo, but this court accepts the factual conclusions underlying the district court's legal determination unless they are clearly erroneous."[2]

### B.
To counter the inherently coercive nature of custodial interrogation, under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless

---

[2] *United States v. Solis*, 299 F.3d 420, 439 (5th Cir. 2002) (quoting *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999); *United States v. Garcia Abrego,* 141 F.3d 142, 171 (5th Cir. 1998)).

it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*. *See California v. Prysock*, 453 U.S. 355, 359 (1981). Nevertheless, the *Miranda* safeguards are "most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one." *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994).

Despite these safeguards, custodial interrogation may still be used to elicit confessions. Once adequate warnings have been given, a suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions. *See*, *e.g.*, *id.* Thus, although one purpose of the *Miranda* framework is to free courts from deciding the voluntariness of a confession under the totality of the circumstances, a similar task devolves on us to determine the voluntariness of a waiver.[3] A defendant's waiver of his *Miranda* rights is effective only if voluntary.

The inquiry whether a valid waiver has occurred "has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Andrews*, 22 F.3d at 1337 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation. *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004). A crucial aspect is the presence or absence of coercive behavior on the part of the government. "[t]he voluntariness of a waiver of [*Miranda* rights] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly v. Colorado*, 479 U.S. 157, 170 (1986).

## C.

At the outset, we address the district judge's concern over Cardenas' alleged waiver of her right to appear before a magistrate judge. To recap, the record demonstrates that Cardenas could not be placed on the Friday 9:00 docket because the complaint against her had not been finalized.[4] With respect to the

---

[3] *See Missouri v. Seibert,* 124 S. Ct. 2601, 2608 (2004) (noting that *Miranda* sprouted from "our concern that the 'traditional totality-of-the-circumstances' test posed an 'unacceptably great' risk that involuntary custodial confessions would escape detection.").

[4] At oral argument it was suggested that perhaps Cardenas was improperly kept off of the 9:00 a.m. docket. Were this the case, suppression of her statements made on the morning of May 16 might be appropriate. *See United States v. Causey*, 835 F.2d 1527, 1529 (5th Cir. 1988). Nevertheless the uncontradicted testimony at the suppression hearing was that the delay was solely attributable to the government's need to complete the criminal complaint. Nowhere in the record does it appear that Cardenas has ever challenged that explanation until oral argument on this appeal. We therefore accept the district judge's tacit determination that this first delay was not the result of any improper behavior (continued...)

2:00 p.m. docket, the district judge found that the government had succeeded, just two minutes before the 2:00 hearing, in persuading Cardenas to waive her right to appear before the magistrate judge. According to the government, at the 2:00 court appearance, a representative of the Federal Public Defenders office (though he would not be formally appointed to represent Cardenas until the following Monday) agreed to postpone her appearance until after the weekend. Cardenas, for her part, argues that because the public defender had not yet been appointed, he could not effectively agree to such an extension.

It appears that in suppressing Cardenas's second statement the district judge relied, to some extent, on what she perceived as inappropriate behavior with respect to Cardenas's right to an initial appearance. Cardenas, on appeal, contends that she did not voluntarily waive her right to an appearance and, as a result, the suppression of her statement is appropriate.

"A person making an arrest within the United States must take the defendant *without unnecessary delay* before a magistrate judge . . . ." FED. R. CRIM. P. 5(a)(1)(A) (emphasis added). Where a violation of Rule 5(a) is shown, the appropriate remedy is the suppression of any evidence obtained as a result of the delay. *Causey*, 835 F.2d at 1529.[5]

Nevertheless, assuming *arguendo* that Cardenas's initial appearance was unnecessarily

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[4](...continued) on the part of government personnel.

[5] *See also Mallory v. United States*, 354 U.S. 449, 453 (1957) (deeming it "necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention").

delayed, only evidence that resulted from the delay would need to be suppressed. A defendant is not prejudiced where "[h]e had already signed a confession and nothing happened in the interval [caused by the unnecessary delay] to damage him or to affect his defense adversely." *Id.*

By the district judge's own findings of fact, Cardenas's second interview took place before the waiver form (which contained a waiver of the right to an appearance) was signed at 1:58 p.m. Thus, no evidence was elicited as a result of the delay. Cardenas therefore can demonstrate no prejudice.

Even if we were to believe that Cardenas was coerced at 1:58 into waiving her right to a prompt appearance before a magistrate judge, the suppression of her second statement would not be an appropriate remedy, because there would be no causal connection between the two. Any references in the district judge's decision, or Cardenas's brief, to the failure to present Cardenas promptly to a magistrate judge are therefore beside the point and cannot support the suppression of Cardenas's second statement.

D.

The district judge did not challenge the validity of Cardenas's waiver of her rights before the first interview. Presumably, therefore, the judge found that Cardenas had voluntarily made a knowing and intelligent waiver of her rights to remain silent and to have counsel present during questioning. This means that at some point between Thursday evening's and Friday morning's interviews, Cardenas either (1) forgot the nature or significance of her rights or (2) chose to exercise them but had her will overridden by intimidation, coercion, or deception.

6

We have never held that a new recitation of rights is required with every break in interrogation. We have found it "incomprehensible" that over a three hour span the defendant went from knowing and understanding the nature of his rights to forgetting them and therefore making an unintelligent decision to speak to police. *Evans v. McCotter*, 790 F.2d 1232, 1238 (5th Cir. 1986). Here, neither the district judge nor Cardenas has contended that a similar onset of amnesia took place. Therefore, if Cardenas's second waiver of rights was involuntary, it must have been the result of the conduct of the government, which the district judge called "rife with intimidation, coercion, and deception."

Even without challenging any of the district judge's specific factual determinations, it is difficult to see how the totality of the circumstances indicates Cardenas's waiver was involuntary. The district judge reasonably determined that contrary to the agents' testimony, Cardenas did not sign the written waiver form until just before the 2:00 p.m. hearing. Nevertheless, it is *undisputed* that Martinez orally reviewed Cardenas's *Miranda* rights with her, the same rights she had waived the previous evening. The district judge concluded,

> Although he had the written waiver document available to him and, in fact, required the Defendant to sign it, the AUSA did not read the document to the Defendant and neglected to advise her that, by signing the statement, she would also "give up [her] rights to appear before a Federal Magistrate or other official for an initial appearance and to have such Magistrate or other official advise [her] of [her] rights, and make a probable cause determination." . . . In fact, the totality of the evidence indicates that the AUSA took her statement in the morning, after orally giving her *some* of her rights, and then, at 1:58 p.m., immediately before the scheduled 2:00 p.m. magistrate docket, had the Defendant sign a form waiving her right to appear before the Magistrate to be advised of her rights by this neutral judicial officer.

(Brackets and emphasis in original.)

The record contains uncontroverted testimony that the oral recitation of what the district judge dubbed "some" of the defendant's rights included her right to remain silent, her right to an attorney, and the right to have an attorney appointed free of charge. The record also indicates, without any contradicting testimony, that Cardenas said she understood these rights and still wished to speak with Martinez. In fact, the only right that was not discussed with Cardenas was her right to an initial appearance. Yet, as we have shown, no prejudice resulted from any delay in bringing Cardenas before the magistrate judge. Because the second interview took place in the morning of May 16 and was completed before the beginning of the 2:00 docket, no statement was taken as a result of any unwarranted delay.

Therefore, despite the district judge's conclusion that Cardenas did not sign the written waiver form until 1:58 p.m. (after giving her statement), the record demonstrates that Cardenas (1) was twice read her *Miranda* rights on the previous evening and voluntarily waived them, and (2) was orally reminded of those rights the next morning, at which time she again chose to waive her rights. The absence of the execution of the written waiver form before to the second interview, therefore, does not demonstrate that Cardenas waived her rights involuntarily.

As other evidence of police "intimidation,

coercion, and deception," the district judge pointed to the fact that the government agents accused her of lying in her first statement and "warned her that the only way she could help herself now was to talk to the AUSA." The agents also encouraged her to cooperate with the government as a witness. We have never held that these sorts of customary police tactics constitute such gross intimidation or coercion so as to overcome a defendant's free will and render his statements inadmissable.[6]

The district judge also relied on the fact that Cardenas remained handcuffed during the second interview. Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression.[7]

The district judge also placed emphasis on the fact that,

once the defendant was taken to the AUSA for further interrogation, she was placed in a chair and questioned in the presence of four men, including the AUSA and the three agents. Three of these men were present throughout the entire interview, but oneSSOvalleSSwas walking in and out of the room, discussing the case on his cell phone in a manner that the Court perceives was designed to intimidate the Defendant by suggesting urgency.

As a threshold matter, we know of no case in which the fact that the interrogating officers were men or women has been determinative of a statement's admissibility. In fact, the adoption of such a presumption would raise equal protection concerns.[8] Without any reference to even the agents' physical stature, let alone any supposedly intimidating tactics employed, the sex of one's interrogators cannot serve as the basis for suppression, at least not under the facts of the present case.

No more credence can be given to the court's emphasis on the number of agents present. Were there only one agent present, we might hear a defendant complain that the absence of corroborating witnesses renders a confession suspect. Indeed, the district judge went on to argue that the lack of electronic transcription of Cardenas's second statement militates toward suppressing it. This concern would only be exaggerated by the presence of merely one agent.

---

[6] *See United States v. Bell*, 367 F.3d 452, 462 (5th Cir. 2004); *United States v. Paden*, 908 F.2d 1229, 1235 (5th Cir. 1990) ("Encouraging a defendant to tell the truth, however, does not render a statement involuntary."); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government."); *United States v. Tatum,* 121 F.Supp.2d 577, 587 (E.D. Tex. 2000) ("[E]ncouraging the defendant to be honest is not so coercive as to render the defendant's incriminating statements involuntary."); *accord United States v. Nguyen*, 155 F.3d 1219, 1223 (10th Cir. 1998).

[7] *See United States v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995); *United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) ("The fact that defendant was wearing handcuffs does not indicate or even suggest that he was coerced.").

[8] *See Caban v. Mohammed*, 441 U.S. 380, 398 (1979) ("[G]ender-based statutory classifications deserve careful constitutional examination because they may reflect or operate to perpetuate mythical or stereotyped assumptions about the proper roles and the relative capabilities of men and women that are unrelated to any inherent differences between the sexes.").

Furthermore, under the district judge's logic, the use of a cell phone during an interview with a suspect contributes to a finding of intimidation. We disagree. It cannot logically be said that their use necessarily renders involuntary a defendant's decision to waive *Miranda* rights. If anything, the use of a cell phone by an interrogating officer might be interpreted as a lack of interest in the goings on of the interview and removes a sense of urgency from the questioning.

The district judge also relied on the lack of immediate transcription of Cardenas' second statement as further evidence of its involuntary nature. That is, somehow, the judge believed the lack of a written copy of the statement, while obviously undercutting the weight of such a confession, indicates that Cardenas's waiver of her *Miranda* rights was somehow the result of coercion or intimidation. On appeal, Cardenas buttresses this argument by pointing out that several jurisdictions require the recording of interviews to ensure their admissibility.[9] Neither this court nor the Supreme Court, however, has ever held that such a requirement is necessary to comply with the Fifth Amendment's protection against self-incrimination.

Although the testimony of a police officer or prosecutor will often be believed over the contradictory account of an accused, this is a problem that goes to the weight to be given to such evidence by the jury, not the voluntary nature of one's waiver of *Miranda* rights. In fact, from the record, it does not appear Cardenas would have any indication that her statement would not be recorded at the time

she waived her *Miranda* rights. Were we the factfinder, we might well be suspect of the accuracy of Ovalle's account of the second interview, given his periodic absence from the conference room. Nevertheless, such questions are customary grist for the jury mill and do not raise constitutional concerns.

E.

In conclusion, Cardenas was informed of, and waived, her *Miranda* rights at least three times before giving the second statement that the district judge suppressed. Throughout this time, the conduct of the government agents was no more coercive or intimidating than can regularly be expected from the very nature of custodial interrogation. There is no indication that Cardenas's will was overridden or that she did not understand the nature of the rights she was waiving. Under the totality of the circumstances, therefore, the waiver of her *Miranda* rights was voluntary, and the statement should be admitted.

The order of the district judge is REVERSED, and this matter is REMANDED for further proceedings in accordance with this opinion.

---

[9] *See, e.g., Stephan v. State*, 711 P.2d 1156, 1161 (Alaska 1985); *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994).