# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-30369

---

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

GREGORY BRIAN HEARN

Defendant-Appellant

---

No. 08-30377

---

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOEL DALLAS HAMMOND

Defendant-Appellant

---

No. 08-30387

---

UNITED STATES OF AMERICA

                                        Plaintiff-Appellee

v.

CASSANDRA WESSON COLLINS

                                        Defendant-Appellant

_____

Appeals from the United States District Court
for the Western District of Louisiana

_____

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

Defendants Gregory Hearn, Joel Hammond, and Cassandra Collins, subject to the right to appeal the rulings on their motions to suppress, pleaded guilty to various counts arising from their possession and distribution of methamphetamine. In this consolidated appeal, the defendants challenge their convictions, arguing that the district court erroneously denied their motions to suppress evidence seized by law enforcement during or shortly after their arrests. We affirm the district court's judgment.

## I. FACTS

### A. Hearn's arrest

In March 2007, officers of the Caddo Parish Sheriff's Office received information from two confidential informants that Hearn and Brad Blanton were selling methamphetamine from room 1711 of the El Dorado Casino Hotel. The second informant agreed to wear an audio transmitter and participate in an

undercover purchase from the two suspects.[1]  The officers set up peephole surveillance of the suspects' room from the room directly across the hall, room 1710.

After furnishing the informant with cash to make the purchase, the officers waited with the informant in the hotel parking lot while she attempted to make phone contact with the suspects.  While waiting, Blanton entered the parking garage and the informant identified him to the officers.  The observing officers in room 1710 saw Blanton enter room 1711.  The informant eventually made phone contact with Hearn and proceeded to room 1711, purchasing twelve grams of methamphetamine from the two suspects.  After leaving the room, the informant told the officers that she saw approximately one pound of methamphetamine in the room and that, in addition to Hearn, another person, later identified as Blanton, also remained in the room.  Following this conversation, one of the officers began drafting an application for a search warrant of room 1711 based on the information learned during the undercover purchase.

While working on the warrant application, the officers continued their peephole surveillance of room 1711.  At some point, Hearn exited the room and proceeded down the hall toward the vending machine; three of the observing officers followed close behind.  When Hearn reached the vending machine, the officers arrested him.  There was no evidence that Hearn was attempting to flee or posed a threat to the observing officers.

Although the officers had yet to obtain a warrant, they feared that Blanton would become suspicious after Hearn failed to return from the vending machine, causing him to possibly dispose of the drugs or arm himself for a confrontation. Accordingly, the officers attempted to enter room 1711 with a key provided to

---

[1]  The officers did not make an audio recording.

3

them by hotel management.  After the key failed to open the room, the officers asked for and obtained Hearn's key.  The officers then entered room 1711 and proceeded to arrest Blanton, who was sitting in a chair.  According to the officers, they seized evidence only in plain view and did not otherwise search the room until obtaining a warrant.

## B. Collins's arrest

Immediately following their arrests, Hearn and Blanton agreed to cooperate in the officers' investigation.  Blanton told the officers that he obtained the methamphetamine found in room 1711 from a woman named "Lora" who was staying in room 930 at the Diamond Jacks Casino Hotel.

The officers went to the Diamond Jacks Hotel and confirmed that a Lora Tomlinson had been registered in room 930, but had moved to Room 940 because of problems with the room's air conditioner.  The agents secured room 941 immediately adjacent to room 940.  At approximately 7:50 p.m., a male later identified to be Joel Hammond knocked on the door to room 940.  Two females in the room began to joke about a "password," but the officers in room 941 could not make out any other specific words.  After a brief time in the room, Hammond left.

Shortly after Hammond left, the officers in room 941 overheard three unidentified females in room 940 engaging in general conversation.  The officers overheard the females counting money and making comments about someone being a real drug dealer and like the ice cream man.[2]  One of the officers testified:  "Basically I figured out there were three girls in the room and they were just talking in general.  One of the first things that I had heard was one girl . . . talking.  At the time I had no idea who was who, but I could just tell there were three different voices.  And one girl stated that, you know: 'Hey, now

---

[2]  "Ice" is a street name for methamphetamine of particular purity or appearance.

4

you're a real dope dealer.' And then another girl was like: 'Yeah, I'm just like the ice cream man selling ice cream everywhere.'" In the magistrate's findings, to which we must give deference, he concluded that there were three women involved in this conversation.

At approximately 8:42 p.m., one of the females in the room, later identified as Collins, left. Four plain-clothed officers followed her down the hall. The officers testified that Collins was clutching her purse closely and acting in a suspicious, nervous manner. They also acknowledged, however, that it would not be unusual for a female to become somewhat nervous when followed closely by four unknown males. As Collins entered the garage area, the officers approached her, identified themselves as police officers, moved her into the parking garage, and stated that they were investigating methamphetamine distribution. They administered *Miranda* warnings and, before asking whether she waived those rights, asked how much methamphetamine she had with her. In response, Collins put her purse down on a nearby bench and advised the officers that the methamphetamine was in her purse. One of the officers opened the purse and found two envelopes containing a large amount of methamphetamine.

The officers then transported Collins to the Louisiana State Police office inside the Diamond Jacks Casino. Collins was asked whether she had any drugs in her vehicle. She responded that she had a small amount of marijuana, a marijuana pipe, and a methamphetamine pipe in her vehicle. Collins verbally consented to a search of her vehicle. The search revealed the items that Collins had mentioned, plus a set of digital scales.

## C. Hammond's arrest

As mentioned, prior to Collins's arrest, Hammond met with the females in room 940 for approximately ten minutes. After Hammond left the room, the officers overheard the females in the room counting money and making

5

comments to the effect that someone was a real drug dealer and like the ice cream man.

Following Collins's arrest, the officers returned to room 941 and resumed their surveillance of room 940. The officers heard two unidentified female voices. The females were utilizing the walkie talkie feature on a Nextel telephone to communicate with a male who was traveling to the hotel from Texas. The officers also periodically heard the sound of a butane lighter, an item often used by individuals smoking methamphetamine.

At approximately 11:13 pm, the officers observed two females, later identified as Lora Tomlinson and Selena Nichols, leave room 940. Tomlinson went into the casino; Nichols went into the lobby, sat, and appeared to be text messaging over her cell phone. A short time later, Hammond met Nichols in the lobby. Nichols and Hammond then went into the elevator followed by a number of undercover officers. When the elevator stopped on the ninth floor, the officers expected the suspects to proceed to room 940. Instead, the suspects went to room 923, a room that the officers did not have under surveillance and knew nothing about. As Hammond was retrieving his card key and attempting to gain entry into room 923, the officers arrested him, as well as Nichols. The district court found that an individual from inside room 923, later identified as Hammond's wife, then opened the room's door to investigate the commotion in the hall. An officer asked Mrs. Hammond for permission to enter the room. There is a conflict of testimony concerning what happened next. One officer testified that Mrs. Hammond attempted to close the door in response to the officer's request, but the officers pushed the door open and walked in. Another officer testified that Mrs. Hammond responded to the officer's request by saying that she needed to put some clothes on. While the door was still open, the officers walked into the room.

6

In any event, after the officers entered room 923, Mrs. Hammond consented to a search of the room. The officers found a small amount of marijuana and a methamphetamine pipe. Hammond, after being advised of his *Miranda* rights, told the officers that he had two syringes in his sock, one loaded with methamphetamine.

## D. District court proceedings

Following their indictments for conspiracy to distribute and possession with intent to distribute fifty grams or more of methamphetamine, the defendants filed separate motions to suppress, which the district court denied. As to Hearn, the court found that exigent circumstances justified the officers' warrantless entry into room 1711. The court also observed that the officers did not actually search the hotel room until they obtained a valid warrant. The district court found that the officers had probable cause for Collins's arrest and that she knowingly and voluntarily waived her *Miranda* rights and freely consented to the officers' search of her vehicle. Finally, the district court found that the officers had probable cause for Hammond's arrest and that exigent circumstances justified the officers' warrantless entry into room 923. After these rulings, the defendants each pleaded guilty to certain charges in the indictment. Each defendant reserved the right to challenge the district court's denial of his or her motion to suppress.

## II. DISCUSSION

In this consolidated appeal, the defendants challenge the propriety of the district court's suppression rulings. When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error. *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002). Factual findings are clearly erroneous only if a review of the record leaves this Court with a "definite and firm conviction that a mistake has been committed." *Id.* (citation omitted).

7

## A. Defendant Hearn – grounds for entering room 1711

Hearn contends that the district court committed reversible error by denying his motion to suppress the evidence. He argues that no exigent circumstances excused the officers' warrantless entry into room 1711, or, alternatively, that the officers created the exigent circumstances through their own actions.

We need not address Hearn's arguments. Even assuming the unlawfulness of the officers' entry into room 1711, the district court's denial of Hearn's motion to suppress must be affirmed based on the untainted portions of the search warrant obtained by the officers shortly after their entry. *See Sojourner T v. Edwards,* 974 F.2d 27, 30 (5th Cir. 1992) (This court can "affirm the district court's judgment on any grounds supported by the record.").

Under the independent source rule, "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Murray v. United States*, 487 U.S. 533, 538-39 (1988) (quoting *United States v. Silvestri,* 787 F.2d 736, 739 (1st Cir. 1986)). The Supreme Court has held that when evidence initially unlawfully seized is subsequently obtained via a search warrant based on independent information, the independent source rule applies to both evidence seen for the first time during the lawful search and evidence seen in plain view at the time of the warrantless search. *Id*. at 541-42. This circuit undertakes a two-part analysis to determine whether the independent source rule applies: "(1) does the warrant affidavit, when purged of tainted information gained through the initial illegal entry, contain sufficient remaining facts to constitute probable cause ('probable cause'); and (2) did the illegal search affect or motivate the officers' decision to procure the search warrant ('effect of the illegal entry')." *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996).

The search warrant obtained by the officers following their entry into room 1711 satisfies both prongs of this two-part analysis. The warrant's affidavit contains ten numbered paragraphs. The first nine paragraphs describe, in detail, the undercover drug purchase that the confidential informant made from Hearn and Blanton in room 1711. Those paragraphs also describe the reliability of the informant and the particular drug evidence she saw while in room 1711. Paragraph ten – the only paragraph that contains information obtained during the officers' purported illegal entry – simply lists items that the officers saw in plain view (more methamphetamine) and notes that the officers did not conduct an actual search at that point. Thus, it is clear that the affidavit, once purged of the information obtained through the officers' allegedly unlawful entry, was sufficient to give the officers probable cause to search room 1711. Moreover, because the officers had begun preparing the search warrant application well before their purported illegal entry – indeed, they began preparing the application immediately following the undercover purchase – it is clear that information obtained during the purported illegal entry did not motivate the officers to seek the warrant. The district court's denial of Hearn's motion to suppress is therefore affirmed.

## B. Defendant Collins

Collins raises several challenges to the district court's denial of her motion to suppress. She argues that the officers violated her fourth amendment rights when they opened the interconnecting door of room 941 in the Diamond Jack's Hotel and listened to the conversations of the occupants in room 940 by placing their ears at the crack of the door. She also argues that the officers lacked probable cause for her arrest and that her *Miranda* waiver and consent to have her vehicle searched were not knowingly and voluntarily given.

### 1. Probable cause

The existence of probable cause is a mixed question of fact and law. *United States v. Muniz-Melchor*, 894 F.2d 1430, 1439 n.9 (5th Cir. 1990). This Court reviews the factual findings underlying the district court's probable cause determination for clear error, but reviews the legal question of whether those facts establish probable cause de novo. *Id.* If an arrest is invalid due to a lack of probable cause, evidence discovered as a result of the arrest is subject to suppression under the Fourth Amendment as the "fruit" of an illegal arrest. *See United States v. Ramirez-Lujan*, 976 F.2d 930, 932 (5th Cir. 1993).

"Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been, or is being, committed and that the individual arrested is the guilty party." *Hart v. O'Brien*, 127 F.3d 424, 444 (5th Cir. 1997) (citation omitted); *see also Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (Probable cause requires only "a reasonable ground for belief of guilt." (citation omitted)). Officers may have probable cause for an arrest even if they have observed no criminal activity and are unaware of the defendant's identity. *United States v. Pentado*, 463 F.2d 355, 361 (5th Cir. 1972). "The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause." *United States v. Alexander*, 559 F.2d 1339, 1343 (5th Cir. 1977). "[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists," *Ornelas v. United States*, 517 U.S. 690, 700 (1996), including inferences "that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

"[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1968). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* However, proximity is not

irrelevant; reasonable inferences may be drawn from a person's connection to the criminal activity. *See Pringle*, 540 U.S. at 372; *United States v. Raborn*, 872 F.2d 589 (5th Cir. 1989).

Following Blanton's arrest, he told the officers that he received his methamphetamine from "Lora" who was registered in room 930 (and then room 940) of the Diamond Jacks Hotel. Blanton's status as a recent arrestee and coinciding motive to lie made this information at least somewhat suspect, but the officers were able to confirm that there was indeed a "Lora" registered at the correct room at the Diamond Jacks Hotel. After setting up surveillance from room 941, a male later identified as Hammond entered the room for approximately ten minutes. Shortly after he left, one of the females in room 940 joked about someone being a real drug dealer now. Another female said something about being like the "ice cream man." At least one officer heard these comments in the context of a conversation among three women. These comments led the magistrate to conclude that there was probable cause to suspect that all three were involved in the ongoing drug-related activity.

The force of *Pringle* here is obvious. Drug dealing was openly discussed in the room, there was even joking about a "password," and a sale was made to a male who was admitted on his knock and left soon after. The three women in the hotel room were not linked to the drug dealing by "mere propinquity." There was a reasonable probability that Collins was a player in the enterprise.[3] The district court's ruling is not error under the facts presented and applicable law.

## 2. *Miranda* waiver and consent to search vehicle

After finding probable cause for her arrest, the district court also concluded that Collins knowingly and voluntarily waived her *Miranda* rights

---

[3] In Chief Justice Marshall's words, "'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation ...." *Pringle*, 540 U.S. at 371 (*quoting Locke v. U.S.*, 7 Cranch 339, 348 (1813)).

and consented to a search of her vehicle. A valid *Miranda* waiver requires two distinct components. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005) (citation omitted). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citation omitted).

The facts relevant to this issue are as follows: four undercover officers approached Collins as she was entering the parking lot of the Diamond Jacks Casino; they identified themselves as officers; escorted Collins into the parking garage; told her that they were investigating methamphetamine distribution; advised Collins of her *Miranda* rights; and asked her questions which she voluntarily answered. Nothing about these facts suggests that Collins's decision to answer the officers' questions resulted from intimidation, coercion, or deception. Collins was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions. *See North Carolina v. Butler*, 441 U.S. 369, 374-76 (1979) (rejecting argument that *Miranda* waivers can never be implicit); *United States v. Cazares*, 121 F.3d 1241, 1243 (9th Cir. 1997) ("To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights."). Collins had extensive experience with law enforcement as evidenced by her criminal history category, and nothing in the record indicates that she lacked average intelligence or education.

Thus, by choosing to answer the officers' questions, Collins demonstrated her intent to forfeit the *Miranda* rights she had just been read. The district court considered the evidence and concluded that the consents were knowingly and voluntarily given. We find no error in this determination.

12

### 3. Eavesdropping techniques

Collins also contends that listening through the connecting door from the adjoining hotel room was improper under the Fourth Amendment. We disagree. The eavesdropping, engaged in from a lawful position in the room next door, was not an unreasonable search under the Fourth Amendment, particularly as to Collins, a temporary guest in a hotel room registered to another. *See, e.g., United States v. Jackson,* 588 F.2d 1046 (5th Cir. 1979).

## C. Defendant Hammond

Hammond contends that the officers lacked probable cause to arrest him outside of room 923. He further argues that the officers did not have consent or valid exigent circumstances to enter room 923, or, alternatively, that the officers themselves created the exigent circumstances. Finally, he contends that his prior Texas conviction which resulted in the imposition of deferred adjudication probation does not support enhancement under 21 U.S.C. § 841(b)(1)(B). Hammond concedes that this final issue is foreclosed by our precedent, *see United States v. Washington*, 480 F.3d 309, 318 (5th Cir. 2007), and thus we do not address it further. Hammond's remaining issues are considered in turn below.

### 1. Probable cause

The record facts provided the officers with reason to believe that Hammond had purchased methamphetamine from the occupants of room 940. They therefore support the district court's probable cause determination.

The officers observed Hammond enter a room registered to an individual they suspected of distributing methamphetamine. He stayed in the room for just a few minutes, then left. The limited duration of Hammond's visit is consistent with a drug transaction. Shortly after he left, the officers overheard one of the females state, "you are a real drug dealer now" (implying that someone had just sold Hammond drugs) and another female state that she was like the ice cream

13

man (meaning she distributed methamphetamine). The officers also overheard the females counting money, activity consistent with their belief that the females had sold Hammond drugs. Later, the officers heard the females using a butane lighter, a device commonly used by those who smoke methamphetamine. Given these facts, it was reasonable for the officers to conclude that Hammond was the individual that the females in room 940 had sold drugs to. Indeed, that is the most reasonable conclusion given these facts.

### 2. Exigent circumstances to enter room 923

As mentioned, the testimony concerning whether Mrs. Hammond consented to the officers' initial entry into room 923 is conflicting and the district court did not make a fact finding on this issue. We need not delve into this conflict, however, because the district court correctly held that Mrs. Hammond's decision to open the door to room 923 created exigent circumstances justifying the officers' warrantless entry.

A district court's finding of exigent circumstances constitutes a factual finding reviewed only for clear error. *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997). Exigent circumstances are generally found where there is a risk to the safety of law enforcement or innocent bystanders, or that evidence might be destroyed. *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997). In *United States v. Rico*, this Court identified a non-exhaustive list of factors that bear on the exigency analysis:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
>
> (2) [the] reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and

14

(5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

51 F.3d 495, 501 (1995) (citation omitted).

When evaluating the existence of exigency, this Court considers "the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996) (citation omitted). Our focus is on the totality of the circumstances leading up to the challenged entry or search rather than on the isolated actions of law enforcement. *Howard*, 106 F.3d at 74. If reasonable minds could differ, we will "not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Blount*, 123 F.3d at 838.

The district court found that, when the officers arrested Hammond and Nichols in the hallway outside of room 923, Mrs. Hammond opened the door to room 923 to see what the commotion was. At this point, the officers already had evidence linking Hammond and Nichols to Lora (an individual that Blanton had identified as his methamphetamine source), and to the drug activities that had transpired in room 940. Because Hammond was attempting to enter room 923, it was reasonable for the officers to assume that it was Hammond's room or one of his accomplice's. Although the officers had no particular knowledge that weapons were located in room 923, "fear for officer safety may be reasonable during drug arrests, even in the absence of any particularized knowledge of the presence of weapons, because in drug deals it is not uncommon for traffickers to carry weapons." *United States v. Maldonado*, 472 F.3d 388, 394 (5th Cir. 2006) (citation and internal quotation omitted). Finally, the officers had no idea who the individual opening the door to room 923 was, or whether that individual intended the officers harm. Under these circumstances, exigency justifying the

15

officers' protective sweep of room 923 existed on two grounds: (1) that the individual opening the door to room 923 might be armed; and (2) that the individual, upon seeing the officers, might attempt to dispose of any drugs contained in room 923.

### 3. Manufactured exigency?

The validity of the district court's exigency finding, however, does not end this Court's inquiry. The government cannot rely on exigent circumstances to excuse a warrantless entry if it created the exigent circumstances through its own actions. *Rodea*, 102 F.3d at 1410. "We distinguish between cases where the exigent circumstances arise naturally during a delay in obtaining a warrant and those where officers have deliberately created the exigent circumstances." *Id*. at 1409 (citation omitted). When determining whether the government created the exigent circumstances, this Court considers not just the motivation of the officers, but also the reasonableness and propriety of the investigative tactics that created the exigency. *Id*.

Hammond contends that the officers created any exigency that may have existed by knocking on the door to room 923, causing Mrs. Hammond to open it. But, as mentioned, the district court concluded that Mrs. Hammond opened the door to room 923 to investigate the commotion created by Hammond's arrest as he attempted to enter room 923 with his card key. Testimony from the suppression hearing supports this fact finding. Thus, Mrs. Hammond's initial appearance in the hallway, and the perceived risk to the officers created by that appearance, resulted from the actions of Hammond, not those of the officers. *See United States v. Newman*, 472 F.3d 233, 239 (5th Cir. 2006) ("When the occupants of the house create the circumstances amounting to the exigency in response to a reasonable law enforcement tactic, the agents cannot have manufactured it themselves."). The reasonableness of the officers' actions are further supported by Hammond's unanticipated decision to attempt to enter

16

room 923 (as opposed to room 940), a room that the officers did not have under surveillance and knew nothing about. Thus, when the officers approached Hammond, they had probable cause for his arrest, he was attempting to enter an unidentified room, and the officers did not know whether the room was occupied. Under these circumstances, we do not conclude that the officers manufactured the exigency created by Mrs. Hammond's sudden appearance in the hallway. The officers were therefore justified in making warrantless entry into room 923.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.