**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 16-40733

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CARLOS GONZALES-GOMEZ,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
August 9, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:15-CR-675

Before REAVLEY, HAYNES, and COSTA, Circuit Judges.

PER CURIAM:*

Carlos Gonzales-Gomez was convicted of possessing more than 100 kilograms of marijuana with intent to distribute and conspiracy to do the same. He had asked that the trial court suppress evidence of statements he made following his detention at an inland checkpoint operated by the United States Customs and Border Patrol. His appeal asserts that the agents at the checkpoint never developed reasonable suspicion of drug trafficking that

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40733

supported extending the stop beyond its limited initial purpose. He also contends that statements he made during this time should not have been admitted because his waiver of *Miranda* rights was involuntary.

## I.

The drug charges against Gonzales and co-defendant Alan Osvaldo Esquivel arose from a vehicle stop on Highway 4 east of Brownsville at the Boca Chica immigration checkpoint. The checkpoint consists of a trailer and a secondary inspection area under a canopy. The district court did not accompany its ruling with findings of fact; we thus construe the evidence about what happened during the stop in the light most favorable to the government as the prevailing party on the motion to suppress. *See United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011).

Border Patrol agents Raul Salazar, Jr. and Omar Soto were on duty the afternoon at issue when a black Ford pickup truck stopped at the primary inspection area. There were five occupants in the truck: Gonzales in the driver's seat; his wife in the passenger seat; and, in the backseat, Gonzales's step-daughter, her minor child, and Esquivel.

Salazar questioned the occupants of the vehicle and referred them to the secondary inspection area. He decided to refer the truck to the secondary inspection area because the three individuals in the backseat (Esquivel, the step-daughter, and the infant) did not provide identification (it turns out all are citizens of the United States). Soto also thought Esquivel "appeared to be nervous by stuttering and avoiding eye contact while answering immigration questions regarding status."

At the secondary inspection area, Soto recognized Esquivel from be-on-the-lookout (BOLO) alerts regarding marijuana trafficking and reminded Salazar about them. Also at the secondary inspection area, Salazar questioned Gonzales about his activities that day. Gonzales told Salazar that he and

2

No. 16-40733

Esquivel had been driving a septic tanker truck looking for work, but the tanker truck broke down so he called his wife to pick them up.

That tanker truck was significant to two other agents who soon[1] arrived at the secondary inspection area. Agents Jeff Davidson and Chris Garcia knew that within the previous hour an abandoned tanker truck registered to Esquivel had been located near fifty-three bundles of marijuana. Those bundles were first observed by a Border Patrol helicopter on patrol east of Brownsville. From the helicopter, an agent observed people crossing the river from the United States to Mexico in a boat. On the U.S. side of the river, there was a fenced property at the end of a dirt road approximately a quarter mile off Highway 4, which runs east from Brownsville. The agent saw a number of bundles left on that property and suspected narcotics smuggling.

Agents on the ground investigated and confirmed the suspicion: the bundles contained marijuana weighing a total of over 500 kilograms. The marijuana was wrapped in single bundles without handles, unlike the usual packaging of three to five bundles wrapped together with straps or ropes for carrying like a backpack. An agent surmised that the single bundles were intended to be concealed in a vehicle.

An agent on the ground then noticed a septic or water tank truck parked approximately one quarter of a mile away at the intersection of Highway 4 and the dirt road leading to the property where the marijuana was found. He

---

[1] The record is underdeveloped and consequently hazy as to the amount of time it took these agents to arrive. This is likely because Gonzales argues only that Davidson and Garcia did not have reasonable suspicion that he or Esquivel had engaged in drug trafficking. At the suppression hearing and on appeal, Gonzales did not argue that the initial phase of the detention (before Davidson and Garcia arrived) was prolonged beyond the time permissible for a suspicionless stop at an inland immigration checkpoint. *See generally United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *United States v. Portillo-Aguirre*, 311 F.3d 647 (5th Cir. 2002). As for this question of the time it took Davidson and Garcia to arrive, the evidence viewed in the light most favorable to the government shows that Davidson and Garcia arrived about five minutes after the vehicle was at the checkpoint.

investigated and discovered that the truck's motor was still hot but the driver was missing. The truck looked old and out of place. The tank portion of the truck had an opening without a cover that revealed a dry, rusted interior which did not look like it had been used recently. The agent surmised that the marijuana bundles would fit in the tank and that the truck was intended to be the transportation vehicle. Another agent determined by radio that the truck was registered to Esquivel.

Border Patrol intelligence agent Jacob Gamboa was monitoring radio traffic during the marijuana seizure and recognized Esquivel's name because he had previously issued two BOLOs associating Esquivel with marijuana trafficking. Gamboa also learned from radio traffic that Esquivel had been stopped at an immigration checkpoint on Highway 4 at about 2:45 p.m. Gamboa directed Davidson and Garcia to the checkpoint.

Upon arrival, Davidson and Garcia "took over" from Salazar and Soto. Davidson spoke with Esquivel and then Gonzales for approximately ten minutes each. During questioning, Esquivel could not provide details about the work he and Gonzales planned to do with the tanker truck, "began stammering and became visibly nervous," and at one point "became highly agitated" and "began rambling incoherently." Davidson also thought that Gonzales was nervous, that he could not give much detail about the work he intended to do with the tanker truck, and that other details he provided were inconsistent with Esquivel's statements. For example, Gonzales said Esquivel had hired him to drive the tanker truck and that they had been looking for water to pump. But Gonzales could not provide the name of the friend who supposedly introduced them, the amount of money he was being paid, or any details about how to operate a water pump. Davidson decided to detain them both "for further questioning." Gonzales and Esquivel were then told that they "were not under arrest, but they were being detained" and both were given

No. 16-40733

*Miranda* warnings.    Both were transported to a Border Patrol station in Brownsville.

Davidson and Garcia then went to investigate the tanker truck before returning to the border patrol station in Brownsville to assist with further investigation.  Gonzales signed a *Miranda* waiver at 6:52 p.m.  Davidson then questioned him again, asking about the same topics they had discussed at the checkpoint.  Gonzales essentially responded the same way.  At some point Gonzalez was formally arrested on drug trafficking charges.

The district court denied Gonzales's motion to suppress without stating any reasons.  Esquivel, who had confessed the second day he was detained at the border patrol station, pleaded guilty and testified at Gonzales's trial.  A jury convicted Gonzales on both counts.

## II.

Gonzales denies that the agents acquired reasonable suspicion of drug trafficking to warrant extension of the initial checkpoint stop.  An agent at an immigration stop "may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial, lawful stop creates reasonable suspicion warranting further investigation."  *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001).

Gonzales belittles what he calls the government's "diamond studded" list of facts that it believes allowed the agents to reasonably suspect that he was involved in drug trafficking.  Evidence sufficient to give an officer reasonable suspicion of a crime need not consist of diamonds: semi-precious stones will suffice.  *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (explaining that the reasonable suspicion standard is less demanding than the probable cause standard).  The following gems were in the hands of the agents at the checkpoint when Davidson and Garcia arrived.  Fifty-three abandoned bundles of marijuana had been found a quarter of a mile from a suspicious

No. 16-40733

tanker truck. The truck was registered to Esquivel, who had been the subject of two drug-trafficking BOLOs issued earlier that year—one just weeks before the stop in question—based on information associating Esquivel with backpackers carrying illegal drugs across the border. And Gonzales admitted that he had been driving a septic truck that had broken down when he called his wife to bring the pickup truck to retrieve them. These facts were sufficient to establish reasonable suspicion of criminal activity by the time Davidson and Garcia arrived at the checkpoint with this information. *Cf. United States v. Jacquinot*, 258 F.3d 423, 426–427 (5th Cir. 2001). The inconsistent and evasive answers to the questions the agents then asked added to that suspicion.

Gonzales also contends that when he signed the written waiver of his *Miranda* rights at the border patrol station early in the evening he did so involuntarily as a consequence of his prolonged detention, especially the earlier time he spent at the checkpoint under the Texas summer sun. The record, however, does not support Gonzales's account. He describes an "ordeal of forty or forty-five minutes in the hot, humid Texas air." But the record shows that he was under a canopy at the checkpoint with access to a restroom. And the timeline read in favor of the prevailing party shows a briefer detention outside.

Even on his account of the facts, Gonzales does not show how any duress from the heat rendered involuntary the waiver he signed roughly three hours later when his conduct was by all accounts cooperative. The waiver was signed, which is "usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Gonzales had earlier been advised of his *Miranda* rights. There is no evidence of police coercion, which is a key consideration in whether a waiver is involuntary. *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005) (citing *Colorado v. Connelly,* 479 U.S. 157, 170 (1986)). Indeed, Gonzales stuck by his story that he was engaged in legitimate work and provided few details which is at odds with a conclusion

6

that police pressure had overcome his free will. *United States v. Melanson*, 691 F.2d 579, 589 (1st Cir. 1981). And the interrogation was not extensive or pointed. Finally, Gonzalez's allegations about his continued detention overnight have no bearing on the voluntariness of a waiver and subsequent statements that occurred earlier in time.

Nor does it matter if Gonzales thought he was being questioned about transporting immigrants rather than drugs. *Michigan v. Mosley*, 423 U.S. 96 (1975), on which he relies, was a case in which the defendant had invoked his right to remain silent for questions about a robbery and was later questioned, after again being *Mirandized* and at that time waiving his rights, about a murder. *Id.* at 104. The Supreme Court allowed the statement the defendant made because that the defendant waived his rights after receiving a second warning. *Mosley* does not stand for the proposition that a defendant must be informed about the object of the investigation before waiving his *Miranda* rights. Indeed, we have held that even affirmative misrepresentations by the interrogator—and here we have at most an omission in failing to notify Gonzales that drugs were the focus of the agent's questions—do not render *Miranda* waiver involuntary unless the "deceit . . . deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (en banc) (quoting *Moran v. Burbine*, 475 U.S 412, 424 (1986)); *see also United States v. Tapp*, 812 F.2d 177, 179 (5th Cir. 1987) (finding waiver voluntary even though agent had incorrectly stated that the defendant was not a target of the investigation). On top of all this, the factual premise of Gonzales's argument is suspect. By the time he signed the waiver at the station, a DEA agent was present along with border patrol, and Davidson testified that the DEA agent told Gonzales he was being investigated for narcotics trafficking.

No. 16-40733

The district court did not err in finding Gonzales's *Miranda* waiver voluntary.

* * *

The judgment of the district court is AFFIRMED.